fide holder of the bonds and coupons, for a valuable consideration, innocently paid on the faith of the validity of the act, and the court cannot, by a technical construction of the act, release the city from the payment of a just debt. Under the authority of the act, the city issued the bonds, and on the faith of it the plaintiff purchased them, and the court will not allow a supposed technicality to defeat the recovery of a debt thus honestly contracted. If the question here attempted to be raised were available, any tax-payer of the city, by a proper application to the circuit court of Racine county, might have restrained the city from issuing the bonds.

I disclaim any conflict in this opinion with decisions of the supreme court of the state, as contained in manuscript opinions of judges of that court. That court, in those cases, considered the matter then decided a legitimate defense, which this court does not. It is not unusual for the courts of the states and of the United States, to disagree in their rulings. The rules of practice and the principles controlling the action and decisions of the different courts are in many instances very dissimilar, and in no respect binding on each other. It is the approximate duty of the supreme court of the state to construe the constitution and statutes of the state, and it is the bounden duty of this court to adopt such construction, in cases involving or requiring it, but not where the construction, contended for on behalf of a party, is not recognized as a legitimate matter of defense.

The act was approved February, 10th, 1853, [which authorized the city of Racine to issue the bonds payable in twenty years. The bonds are payable February 10, 1873],[3] and the coupons are payable on the 10th of February in each year. The bonds bearing date March 15, 1853, did not allow twenty years, nor one full year, for the first year's interest to run. This is not a suit for the principal of the bonds, nor for the first year's interest, and consequently that objection to these bonds is not tenable.

The city authorities put their own construction upon the act, and carried it out by issuing bonds as they did, and approved their acts by paying the annual interest on the bonds for several years after the publication of the act, and receiving certificates of stock of the railroad company as consideration for the bonds.

And as the people of the city approved of all this by electing commissioners, under the act, to represent the stock thus received for the bonds, at the annual elections of the company, while the bonds were in circulation as promissory notes, payable to bearer; I think they should not be permitted to object to the validity of their own acts. The people of the city of Bridgeport confirmed sim-

ilar bonds to these. City of Bridgeport v. Housatonic R. Co., 15 Conn. 475. The motion for a new trial will be overruled and judgment entered on the verdict.

NOTE. The rulings of the supreme court of Wisconsin will be found in the following cases: The charter of the city of Janesville, authorizing a vote to be taken on the question of issuing bonds to aid in the construction of a railroad, was published in the private acts, and the certificate of publication attached to the volume was dated October 4, 1853, held: by the supreme court of Wisconsin, that the charter was first published by authority at the date of the certificate, and that it did not authorize the common council to pass an ordinance, and the people to vote on the question in July, nor the council to issue the bonds in August previous to the authoritative publication. Every person taking these bonds is chargeable with a knowledge of this want of authority. Cole, J., dissenting. Clark v. City of Janesville, 10 Wis. 136. The charter is a general law, within the provision of article 7, § 21, of the constitution of Wisconsin, which requires that "no general law shall be in force until published." The words, "general law," as here used, have the same meaning as "public act," in the ordinary acceptation, and they are convertible terms. Id. Bonds issued by the officers of a town pursuant to a vote of the people thereof, before the law authorizing such vote and issue of bonds was published, are void. Town of Rochester v. Alfred Bank, 13 Wis. 432, affirmed in Berliner v. Town of Waterloo, 14 Wis. 378. For a full citation of authorities on the subject of municipal bonds, see Schenck v. Marshall Co. [Case No. 12,449], decided by Drummond, J., June term, 1866. In Marcy v. Ohio [Id. 9,457], decided in the Northern district of Illinois, in March, 1873, Drummond, J., holds, that a bona fide holder of coupons payable to bearer, issued by a town by virtue of a special act of the legislature, is not bound to prove that every prerequisite has been complied with, and that a mere irregularity in the form of an election does not constitute a good defense as against him. Consult also Mygatt v. Green Bay [Id. 9,998], and Goedgen v. Manitowoc County [Id. 5,501]. For an elaborate discussion of the bonds and contracts of municipal corporations, see Dill. Corp. §§ 370–426.

[See Case No. 1,213.]

LULL (BROWN v.). See Case No. 2,018.

LULL (KEMBLE v.). See Case No. 7,683.

## Case No. 8,604.

### The LULU.

[1 Abb. (U. S.) 191; Chase, 162; 1 Am. Law T. Rep. U. S. Cts. 103; 1 Balt. Law Trans. 52.][1]

Circuit Court, D. Maryland. April Term, 1868.[2]

**"FOREIGN PORT"—MARITIME LIEN FOR SUPPLIES.**

1. A port in another state from that in which a vessel is enrolled and registered, is deemed, in the absence of special facts controlling the question, a "foreign" port, within the rule which confines the maritime lien for supplies to cases of supplies furnished in a foreign port.

2. To entitle a material-man to claim a maritime lien upon a vessel for supplies furnished to

---

[3] [From 8 Am. Law Reg. 603.]

[1] [Reported by Benjamin Vaughan Abbott, Esq., and by Bradley T. Johnson, Esq., and here compiled and reprinted by permission.]

[2] [Reversed in 10 Wall. (77 U. S.) 192.]

her in a foreign port, upon the order of the master, he must show that the supplies in question were necessary to the vessel, and also that some special exigency or necessity existed to require the master to obtain them upon the credit of the vessel. To show only that the supplies were needed, is not enough.

[See note at end of case.]

[Appeal from the district court of the United States for the district of Maryland.]

Hearing upon several libels for repairs and supplies. The principal suit was brought by the persons composing the firm of Skinner & Forsyth, for repairs made upon the steamer Lulu. It was heard with other suits for supplies.

CHASE, Circuit Justice. This is a suit in admiralty to enforce a lien claimed upon the steamer Lulu, for repairs made upon her by the libelants at the request of the master. It is consolidated with other suits, all brought by material-men for supplies or repairs to the vessel. The Lulu was a steamer owned in New York, which was her home port, but employed in the trade between Baltimore, in Maryland, and Charleston, in South Carolina. When the libel was filed she had been in the trade about eleven months—from April, 1866, to March, 1867. The repairs and supplies for which satisfaction is sought, were furnished in Baltimore, during and after July, 1866; but chiefly in November and afterwards. They were furnished at fair prices, and were proper and necessary.

In each suit the New York Guaranty & Indemnity Company has filed a claim and answer, asserting a prior right to satisfaction out of the proceeds of the steamer; which has been sold under an order of the court. The claim of this respondent is founded upon a bill of sale made to the company on August 24, 1866, by the former owners of the Lulu, in consideration of twelve thousand dollars. This bill of sale, though in form absolute, was intended as a mortgage to secure repayment of the advance, in six months from the date; but no part of it has been repaid.

The only question in this cause is, whether the material-men, under the circumstances of the case, had a lien for their repairs and supplies; for if they had, this lien is superior to that created by the bill of sale or mortgage, whether prior or posterior in time. It was insisted on the argument, that Baltimore was the real home port of the Lulu, and that there could be no lien for repairs and supplies furnished in the home port; and this might be a material circumstance in the decision of the case, if it appeared that the Lulu was chartered to citizens of Baltimore, for the Charleston trade. Such a charter might be considered as transferring her home port from New York to Baltimore; especially when taken in connection with the proved facts of the case, which show that Baltimore might very fairly be called the actual home of the Lulu, during the time of the transactions in controversy. But there is no evidence of such a charter; and it is clear that under the American decisions, Baltimore, being in another state than that in which the vessel was owned and enrolled, must be regarded as a foreign port; and that, in a proper case, material-men would be entitled to a lien for supplies there furnished.

The question then occurs: "Were the repairs and supplies in question furnished under such circumstances as would entitle the material-men to the liens which they claim?" The general rule applicable to this class of cases was first laid down in The General Smith, 4 Wheat. [17 U. S.] 443, as follows: "When repairs have been made or necessaries have been furnished to a ship in a port of a state to which she does not belong, the general maritime law, following the civil law, gives the party a lien on the ship itself for his security, and he may well maintain a suit in rem in the admiralty to enforce his right." The same rule, in substance, was affirmed in Peyroux v. Howard, 7 Pet. [32 U. S.] 324; in The Nestor [Case No. 10,126]; and in several other cases. The nature and degree of necessity essential to the creation of a lien for repairs and supplies was much considered in the case of The Laura, or Thomas v. Osborn, 19 How. [60 U. S.] 28, 35. The court then said, in substance, that it is only in case of necessity that the master can hypothecate the vessel by a bottomry bond or other express obligation, or create a lien by obtaining repairs and supplies on her credit (page 30), and that, to constitute a case of apparent necessity, not only must the repairs and supplies be needful, but it must be apparently necessary for the master to have a credit, to procure them (page 31). If the master has funds which he ought to apply in payment, but does not, and the furnisher knows this fact, or has the means by due diligence to ascertain it, then no case of actual necessity to have a credit exists, and no maritime lien is created by furnishing repairs and supplies. The rule on this point was stated by Chief Justice Taney, who, with Justices McLean and Wayne, dissented from the judgment of the majority, somewhat less stringently, as follows: "That repairs and supplies in a foreign port, if necessary to enable a vessel to proceed, are presumed to have been furnished and made on the credit of the vessel, unless the contrary appears, as well as on that of the master and owners; and creates a lien which may be enforced in admiralty." Page 38. The difference between the court and the dissenting justices on this point was that the former held that, in order to the creation of the lien, there must be a necessity for the credit as well as a necessity for the supplies, while the latter seem to have thought that if the supplies were necessary the credit may be presumed.

The same subject was further considered

at the same term in the case of The Sultana, or Pratt v. Reed, 19 How. [60 U. S.] 359. That case was in its general features much like the cases now under consideration. It was a libel against the steamer Sultana for supplies of coal furnished from time to time, from June, 1852, to May, 1854, and the lien for supplies was contested by the answer, which set up a claim under a prior mortgage on the steamer, dated October 31, 1863. The court held that the material-man had no lien, and decreed the proceeds to the mortgagees. The court stated the rule thus: The proof of a necessity at the time of procuring a supply for a credit on the vessel * * * "is as essential as that of the necessity of the article itself." It is only under very special circumstances and in an unforeseen and unexpected emergency that an implied maritime hypothecation can be created.

The decision of the case was not put upon the ground that the supplies were unnecessary, but upon the ground that there was no sufficient proof of a necessity for the implied hypothecation of the vessel, or of any unexpected or unforeseen exigency that required it.

A distinction between the cases now to be adjudged and the cases thus decided was attempted in the argument; but I find myself unable to make any which has substance. That decision was by a unanimous court, and was on the very point which must govern these cases; namely, the necessity of the credit; and I am unable to discover any very special circumstances, any very unexpected and unforeseen emergency in these cases which will take them out of the application of the rule which the decision cited establishes. The repairs and supplies in all of the cases now presented were furnished in the ordinary course of trade, and under ordinary circumstances. There is no proof whatever of any unusual exigency. Except in the case of Coleman v. Bailey [Case No. 2,981a], there is no averment of the necessity of a credit to the steamer.

It was contended also that the rule goes beyond any that has heretofore been applied to material-men by the courts; and I must admit, that I have found no other case in which proof so stringent as that required by it has been held essential to a lien for repairs and supplies. But the rule established by the unanimous judgment of the supreme court is not on that account the less binding upon me.

I am constrained, therefore, to hold that the furnishing of the repairs and supplies set forth in the several libels did not create a maritime lien in favor of the libelants; and that the respondents are entitled to the proceeds in the registry after payment of costs.

Decree accordingly.

[NOTE. Dissatisfied with this decree reversing the sentence of the district court, the libelants appealed to the supreme court. Mr. Justice Clifford delivered the opinion of the court. As it was not shown that the master had funds, or that the owners had sufficient credit, or that there were any circumstances or reasons sufficient to put the repairers and furnishers upon their inquiry as to those facts, the court would presume a necessity for credit. since it appeared from the testimony that the repairs and supplies ordered by the master were necessary for the vessel. The decree of the circuit court was accordingly declared erroneous, and the cause remanded, with instructions to enter a decree affirming the decree of the district court. 10 Wall. (77 U. S.) 192.]

## Case No. 8,605.

### LUMA v. ATLANTIC MUT. INS. CO.

[13 Hunt, Mer. Mag. 557.]

Circuit Court, D. Massachusetts. Dec., 1845.

MARINE INSURANCE — RECOVERY — DISTINCT AND SEPARATE LOSS — ONE LOSS BEING CONSEQUENT UPON A PREVIOUS ONE — PROVINCE OF JURY.

[1. Distinct and separate losses on one voyage cannot be added together to make up an average of 5 per cent. under an insurance policy.]

[2. It is a question for the jury whether the losses to a vessel in two gales, ten days apart, in the first of which she lost part of her sails and bulwarks, and in the second the movables on deck, were distinct, or consequent one upon the other, so as to constitute a single loss, averaging 5 per cent., under the policy.]

This was an action of assumpsit, in which the plaintiff sought to recover of the defendants a partial loss on a policy, made by them, March 4, 1844, on the brig Columbia, on a voyage from Boston to Savannah. It appeared in evidence, that the brig sailed on this voyage about the 10th of March; that on the 17th of the same month, she experienced a gale and a heavy sea, which blew away the fore top-mast staysail, carried away a great part of the bulwarks, and monkey rail, stove in the cook's galley, and shipped several very heavy seas, which made her labor very hard; that after this she continued the voyage, lying to in two or three instances, but with generally moderate weather, carrying all sail, till the 27th of March, when she experienced another gale, and shipped a sea, burying the brig all up in a clear sheet of foam, and swept her decks of her jolly-boat, spars, roundhouse, and two water casks. the fore spencer being also carried away. There was no other loss on the voyage. There were several questions of law, raised by the defendants, growing out of other evidence, and the transactions for a settlement of the loss, a reference of the matter having been made by the plaintiff's agents in Boston, and a decision given by the arbitrator against his claim, by which he refused to abide. But the main question raised, was, whether these two losses could be added together to make an average of five per cent. under the policy; and upon this point there was considerable evidence.

HELD BY THE COURT (WOODBURY, Circuit Justice) that distinct and separate losses on the vessel. could not be added together to make up five per cent., and that the